IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

THE LORD ABBETT MUNICIPAL　　　）
INCOME FUND, INC.,　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　Plaintiff,　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　v.　　　　　　　　　　　　　　）　　CASE NO. 1:10-CV-477-WKW [WO]
　　　　　　　　　　　　　　　　　　　）
JOHN M. TYSON, JR., *et al.*,　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　Defendants.　　　　　　　）

## MEMORANDUM OPINION AND ORDER

The Lord Abbett Municipal Income Fund, Inc. (the "Fund") purchased municipal bonds issued by the Cooperative District of Houston County – Country Crossing Project (the "Cooperative District") in 2009. The bonds were to be repaid by pledged revenues, consisting in part of "entertainment fees" generated by Country Crossing, a start-up, multi-use entertainment venue located in Houston County, Alabama. Entertainment fees from electronic bingo gaming at Country Crossing were the foundation of the pledged revenues, but those revenues were also supplemented by property, retail, lodging, and event fees. Country Crossing owed the entertainment fees to the Cooperative District, which in turn was contractually bound to repay the bonds from the pledged revenues. Prior to issuance of the bonds, the Cooperative District obtained a state court order from the Houston County Circuit Court "validating" the bonds (the "Validation Order").[1]

---

[1] The Fund claims that the Validation Order created valuable property rights through the Fund's privity with the Cooperative District. The Fund alleges that by statute, the Validation Order "shall never be called in question in any court in this state." Ala. Code § 11-81-224; (Am. Compl. ¶ 20.)

Country Crossing was soon in distress, and much of Houston County with it, when the Former Governor of Alabama, Defendant Robert M. Riley (the "Former Governor"), determined that electronic bingo machines are illegal in Alabama. Under threat of the seizure of electronic bingo machines by the Former Governor's Task Force on Illegal Gambling (the "Task Force"), headed by Defendant John M. Tyson Jr. ("Mr. Tyson"), Country Crossing decided to close its doors. Because of the absence of pledged revenues flowing into the coffers of the Cooperative District, the Fund suspects that the bonds are or may become worthless, and in any event, alleges that they have suffered a significant loss in value. The Fund also fears the Cooperative District will default on its obligations under the bonds.

Currently pending are Defendants' motion to dismiss (Doc. # 13) and the Fund's motion for a preliminary and permanent injunction (Docs. # 15-16). Defendants move to dismiss the Fund's Amended Complaint (Doc. # 11 ("Am. Compl.")), for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. The Fund seeks a preliminary and permanent injunction preventing Defendants, Alabama Governor Robert J. Bentley[2] ("Governor Bentley") and Mr. Tyson,[3] from depriving it of its alleged property rights in bond revenues generated by electronic bingo machines at Country Crossing

---

[2] This case was originally filed against former Governor Riley in his official capacity. On January 17, 2011, Robert J. Bentley was sworn in as Governor. Pursuant to Federal Rule of Civil Procedure 25(d), Governor Bentley is substituted for the Former Governor as a Defendant in this case.

[3] On January 18, 2011, Alabama media outlets reported that Governor Bentley issued an Executive Order abolishing the Governor's Task Force on Illegal Gambling. These reports have played no role in this decision, and the court has only relied on those documents that are properly before the court on Defendants' motion to dismiss. *See, e.g.,* Sebastian Kitchen, *Bentley Disbands Task Force on Gambling, Expects Budget Cuts*, Montgomery Advertiser, Jan. 19, 2011, at 1A.

without procedural due process.  For reasons to be explained, the court lacks subject matter jurisdiction to adjudicate the Fund's claims, and Defendants' motion to dismiss is due to be granted pursuant to Federal Rule of Civil Procedure 12(b)(1).  The motions for preliminary and permanent injunction are due to be denied as moot.

## I.  JURISDICTION AND VENUE

The Fund initially alleged that subject matter jurisdiction existed under 28 U.S.C. § 1332.  (Compl. ¶ 5.)  The Fund amended its complaint to include a claim under 42 U.S.C. § 1983, asserting subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.  There is no dispute as to personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(1) may assert either a factual attack or a facial attack to jurisdiction.  *See McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007); *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). A factual attack challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Lawrence*, 919 F.2d at 1529 (internal quotation marks omitted). In a facial attack, on the other hand, the court examines whether the complaint has sufficiently alleged subject matter jurisdiction.  As it does when considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court, on a Rule 12(b)(1) facial attack, construes the complaint in the light most favorable to the plaintiff and accepts all well-pled

facts in the complaint as true.  *McElmurray*, 501 F.3d at 1251 (noting in a Rule 12(b)(1) facial challenge, a plaintiff has "safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised").  As under a Rule 12(b)(6) motion to dismiss, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim[,] then the [c]ourt may consider the documents part of the pleadings."  *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th  Cir. 1997).  It is also the law in this Circuit that where exhibits are attached to the complaint and those "exhibits contradict the general and conclusory allegations of the pleadings, the exhibits govern."  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).   Defendants' Rule 12(b)(1) motion will be treated as a facial attack.

Although in a facial attack well-pled facts are accepted as true, "the court is not required to accept a plaintiff's legal conclusions."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.")).  In evaluating the sufficiency of a plaintiff's pleadings, the court makes reasonable inferences in plaintiff's favor, "but [is] not required to draw plaintiff's inference."  *Aldana v. Del Monte Fresh Produce, N. Am., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).  Similarly, "unwarranted deductions of facts" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations.  *Id.*; *see also Iqbal*, 129 S. Ct. at 1951 (conclusory allegations are "not entitled to be assumed true").

### III.  FACTS

The facts necessary for deciding Defendants' motion to dismiss follow.

**A.**     **The Cooperative District and Country Crossing**

The roots of this case lie in the Houston County Commission's February 25, 2008 Development Agreement, which authorized a capital improvement cooperative district in Houston County, Alabama.  (Am. Compl. ¶¶ 8-9.)  The Cooperative District is a public corporation established by the Houston County Commission pursuant to Alabama Code § 11-99B-1, *et seq.*, with powers relating to economic development in the county.  (Am. Compl. ¶¶ 9-10.)  As detailed in the Development Agreement, the Cooperative District was tasked with raising the capital necessary for the acquisition and construction of the Country Crossing project.  (Am. Compl. ¶ 8.)  The Development Agreement also called for the inclusion and operation of electronic bingo machines at Country Crossing.  (Am. Compl. ¶ 9.)  Country Crossing is a mixed-use development located in Houston County that includes a music amphitheater, hotels, restaurants, an RV Park, and electronic bingo machines.  (Am. Compl. ¶ 8.)  The Limited Offering Memorandum describes Country Crossing as "a one-of-a-kind active lifestyle and entertainment destination, complete with year-round music venues, themed commercial and retail space, restaurants, and a family entertainment center. [Country Crossing] will also include a gaming component."  (Am. Compl., Ex. 1B, at 28.)

**B.**     **The Financing and Organization of Country Crossing**

The Limited Offering Memorandum describing the Series 2009 bonds sheds some light on the complicated legal and business relationships involved in the Country Crossing project.  (Am. Compl. Ex. 1B, at 10.)  At the heart of the Country Crossing project is Ronnie Gilley Properties, LLC (the "Developer").   As described in the Limited Offering Memorandum, the Developer was to own and, through other subcontractors, subsidiaries, and licensees, operate Country Crossing.  (Am. Compl. Ex. 1B, at 28, 34 ("The Developer will limit its activities to the ownership and operation of [Country Crossing].").)  The Series 2009 bonds issued by the Cooperative District financed the construction of the public infrastructure necessary for Country Crossing.  (Am. Compl. Ex. 1B, at 27.)  The public infrastructure was built on real property owned by the Developer.  (Am. Compl. Ex. 1B, at 29.)  Pursuant to the Development Agreement, the Developer leased its real property to the Cooperative District for a period of time "greater than the economic life" of the public infrastructure financed by the bonds.  (Am. Compl. Ex. 1B, at 28.)  The Developer also acted as the project manager for all construction activities at Country Crossing, managing the contracts between the Cooperative or the Improvement District of Houston County – Country Crossing Project (the "Improvement District") and two construction companies owned in part by the Developer.  (Am. Compl. Ex. 1B, at 29.)

The Developer was likewise tasked with locating and contracting with a nonprofit organization ("Nonprofit Bingo") willing to offer electronic bingo at Country Crossing.

(Am. Compl. Ex. 1B, at 30.)  This was necessary because "neither the Developer nor any affiliate of the Developer can operate gaming operations directly."  (Am. Compl. Ex. 1B, at 30.)  To that end, per the Limited Offering Memorandum, "[t]he Developer, through a wholly-owned special purpose entity, will construct the gaming facility for the nonprofit and will require the nonprofit to pay the standard, market rates that are not tied to the nonprofit's revenues or profits."  (Am. Compl. Ex. 1B, at 31.)  The Developer also planned to enter into a development and equipment licensing agreement with Nonprofit Bingo "to supply the nonprofit with electronic bingo gaming equipment and related software as well as meet certain development obligations."  (Am. Compl. Ex. 1B, at 31.)  "In return, the Developer will be entitled to consideration to compensate it for its services and economic risk in an amount between 55% and 65% of the 'hold' or 'net daily win.'"  (Am. Compl. Ex. 1B, at 31.)  The Developer was also to contract with a management company to manage and oversee Country Crossing's "development and licensing operations for a fee equal to 10% of all of [Country Crossing's] earnings before interest, depreciation, taxes, and amortization from such development and licensing operations."  (Am. Compl. Ex. 1B, at 31.)   The Limited Offering Memorandum further explained that "[i]t is possible that any of these development and licensing services to be subcontracted out by the Developer may be provided by the Developer . . . ."  (Am. Compl. Ex. 1B, at 31.)  Finally, the Limited Offering Memorandum explained that the Country Crossing brand will be licensed for use in the naming of Nonprofit Bingo's operations.  (Am. Compl. Ex. 1B, at 31.)

C.    **The Series 2009 Bonds**

Before issuing the Series 2009 bonds necessary to finance the public infrastructure at Country Crossing, the Cooperative District filed a Validation Petition in the Circuit Court of Houston County, Alabama, on July 30, 2009.  (Am. Compl. ¶ 11.)  On October 1, 2009, the Circuit Court of Houston County held a hearing on the Validation Petition and after the hearing entered an order titled "Findings of Fact, Conclusions of Law, and Final Judgment." (Am. Compl. ¶ 15.)  The Fund contends that the Validation Order validated the Series 2009 bonds and each source of payment included in the Validation Order.  (Am. Compl. ¶ 15.)

The Series 2009 bonds issued by the Cooperative District are payable, in part, from (1) revenues derived from special assessments collected by the Improvement District, (2) the special fees imposed by the Cooperative District on all tangible property retail sales in the District, (3) the entertainment fees charged on each electronic bingo machine, (4) the Lodging Fees to be imposed by the Cooperative District on persons or businesses providing lodging in the District, and (5) the special fees charged by the Cooperative District for public events held at Country Crossing.  (Am. Compl. Ex. 1B, at 3.)  Together these fees make up the pledged revenues that the Improvement District and Cooperative District use to fund the Series 2009 bond payments and expenses.  (Am. Compl. Ex. 1B, at 21.)[4]  The Cooperative District has assigned its rights in these pledged revenues to the bond Trustee for payment to

---

[4] To summarize, based on the Limited Offering Memorandum and pleadings, electronic bingo is offered at Country Crossing by a nonprofit bingo organization; entertainment fees are generated by the electronic bingo machines; the entertainment fees are paid to the Cooperative District; and from those fees and other pledged revenues, the Cooperative District services the bonds through the Trustee.

the Series 2009 bondholders.  (Am. Compl. Ex. 1B, at 22.)  The pledged revenues themselves are collected by Wrathell, Hart, Hunt & Associates and AlaTax, Inc., and paid directly to the Trustee of the Series 2009 bonds.  (Am. Compl. Ex. 1B, at 22.)  On November 19, 2009, the Fund purchased $5,000,000 of Series 2009 bonds issued by the Cooperative District.  (Am. Compl. ¶¶ 1, 19.)

D.     **The State's Involvement with Country Crossing**

Former Governor Riley and Mr. Tyson's threats and attempt to seize the electronic bingo machines at Country Crossing indirectly bring these parties together.  Former Governor Riley entered Executive Order No. 44, dated December 30, 2008, creating a Task Force on Illegal Gambling.  (Am. Comp. ¶ 4.)  He appointed Mr. Tyson as the Commander of the Task Force.  (Am. Compl. ¶ 4.)  Former Governor Riley and Mr. Tyson have announced repeatedly and publically their opinion that electronic bingo machines are illegal under Alabama law.  (Am. Compl. ¶ 24.)  Mr. Tyson has also threatened to conduct a warrantless seizure of the electronic bingo machines at Country Crossing.  (Am. Compl. ¶ 24.)  Mr. Tyson further has stated that after seizing the electronic bingo machines, he would assert in Alabama courts that the electronic bingo machines are illegal contraband.  (Am. Compl. ¶ 24.)  On a date indeterminate from the pleadings, Mr. Tyson, with members of the Task Force and Alabama State Troopers, arrived at Country Crossing to raid and seize the electronic bingo machines.  (Am. Compl. ¶ 24.)  The Fund fails to allege the sequence of events that transpired next, but it alleges generally that "[b]ecause Country Crossing *was closed at that time* and Tyson did

not have a search warrant, he was unable to seize the electronic charity bingo machines upon which the Entertainment Fees are levied." (Am. Compl. ¶ 24 (emphasis added).) In so alleging, the Fund has not informed the court what third party made the decision to close Country Crossing,[5] or what third party is responsible for the ongoing decision to keep Country Crossing closed.[6]

E.     **The Fund's Causes of Action**

The Fund claims that Defendants have interfered with the operation of electronic bingo at Country Crossing. (Am. Compl. ¶ 26.) Further, the Fund contends that "[a] seizure of the electronic charity bingo machines would have a disastrous impact on the ability of the Cooperative District to pay Entertainment Fees – a significant source for the payment of the Series 2009 bonds." (Am. Compl. ¶ 26.) The Fund alleges that the threat of seizure of the electronic bingo machines by Defendants creates a constitutional deprivation of its property interest in the revenues generated by the electronic bingo machines for payment of the Series 2009 bonds. (Am. Compl. ¶ 33.) The Fund maintains that, under Alabama law, the Validation Order created contractual rights and a property interest for the Fund in the Series 2009 bonds and the revenue streams funding the bonds. (Am. Compl. ¶¶ 29-30.) The Fund

_____

[5] The importance of this omission will become clear in Part IV.C in the discussion of the Fund's alleged Article III standing. Because it is not clear what third party made the decision to close, it will be attributed to Country Crossing generically. A fair reading of the documents attached to the Amended Complaint would implicate, at minimum, the nonprofit operator and its manager. However, it is not necessary to this opinion to discern that third party's specific identity.

[6] Electronic bingo operations were not the only closure. All operations at Country Crossing, including restaurants, entertainment, shopping, and lodging, were terminated. (Am. Compl. ¶¶ 24, 26; Doc. # 18, at 19-21.)

concludes that under Alabama law, the Validation Order is itself a contract in which the Fund

has property rights because it is a party in privity with the Cooperative District.  (Am. Compl.

¶ 32.)  Thus, the Fund alleges that

> Defendants' continued interference with the operation of charity bingo at Country
> Crossing, up to and including seizure of the electronic charity bingo machines upon
> which the Entertainment Fees are levied, has deprived and will continue to deprive
> [the Fund] of its property interests in the Series 2009 [b]onds, in the revenue streams
> pledged as payment for those [b]onds, and in its property and contractual rights in the
> Validation Order.

(Am. Compl. ¶ 33.)

The Fund further alleges that Alabama law and the Alabama courts have deprived it

of an adequate state law remedy for the deprivation of its property interest.  (Am. Compl. ¶

34.)  Specifically, the Fund alleges that it is not able to enforce or seek reinstatement of its

property rights in the courts of Alabama because the Alabama Supreme Court has held that

Alabama courts do not have jurisdiction over declaratory judgment actions regarding the

legality of electronic bingo machines sought to be seized, but not actually seized, by the Task

Force.  (Am. Compl. ¶ 27.)  Nor do the Alabama courts have subject matter jurisdiction to

enter an injunction that would "'interfere with the enforcement of criminal laws through a

civil action.'"  (Am. Compl. ¶ 27 (quoting *Tyson v. Macon Cnty. Greyhound Park, Inc.*, 43

So. 3d 587, 589 (Ala. 2010).)  Importantly, the Fund alleges it would lack standing under

Alabama law to assert its alleged property rights in a post-seizure civil forfeiture proceeding concerning the electronic bingo machines.[7]  (Am. Compl. ¶ 27.)

To remedy its alleged deprivation of due process, the Fund asks this court first to provide it with a hearing on its declaratory judgment claim.  (Am. Compl. ¶¶ 39-40.)  The Fund also asks the court to grant it preliminary and permanent injunctive relief preventing Defendants from: "(1) asserting in any court in the state of Alabama that the operation of the electronic charity bingo machines in the Cooperative District is illegal or prohibited under Alabama law; and (2) from taking any actions to interfere with the operation of electronic charitable bingo machines in the Cooperative District."  (Am. Compl. ¶ 48.)   Finally, the Fund asks this court to declare that

> (a) the electronic bingo machines upon which the Entertainment Fees are levied may be legally operated in the Cooperative District; (b) neither Defendants or anyone else may be heard at this late date to call the validity or legality of the electronic charity bingo machines upon which the Entertainment Fees are levied into question; and (c) Defendants are barred from attacking the operation of electronic charity bingo machines in the Cooperative District or from seeking to prevent the operation of electronic charity bingo machines in the Cooperative District.

(Am. Compl. ¶ 55.)

## IV.  DISCUSSION

Defendants move to dismiss the Fund's case for lack of subject matter jurisdiction or, in the alternative, for the Fund's failure to state a claim upon which relief can be granted.

---

[7] An observation: It is peculiar that the Fund admits it would have no standing in state court to contest the seizure of a source of its bond revenues, the electronic bingo machines, but would claim standing in this court for essentially the same injury.  The Fund's procedural due process claim is the source of this peculiarity.

Defendants argue that the court lacks subject matter jurisdiction to decide the Fund's procedural due process claim on the grounds that the claim violates the Eleventh Amendment and principles of federalism. (Doc. # 13, at 6-10.)  In the alternative, Defendants argue that the court should abstain from hearing the Fund's procedural due process claim.  (Doc. # 13, at 9-10.)  Further, Defendants argue that the Fund fails to state a claim upon which relief can be granted on both its federal and state law claims.  (Doc. # 13.)  Finally, Defendants argue that the Eleventh Amendment bars the court from exerting subject matter jurisdiction over the Fund's state law claims.  (Doc. # 13, at 5-6.)  Happily, examination of each of the parties' federalism and abstention arguments is not necessary, because subject matter jurisdiction is absent.[8]

Because Defendants' Rule 12(b)(1) motion will be treated as a facial attack, only the Amended Complaint and attached exhibits will be considered.  For the reasons explained, subject matter jurisdiction is lacking, and, thus, Defendants' Rule 12(b)(1) motion to dismiss will be granted.  The Rule 12(b)(6) motion, as well as the motions for preliminary and permanent injunctive relief, will be denied as moot.

The court's analysis is organized as follows:  Part IV.A:  The Fund's procedural due process claim (Count I) is not ripe; Part IV.B:  *Ex parte Young* does not support this court's subject matter jurisdiction; Part IV.C: The Fund appears to lack standing; and Part IV.D:  The Eleventh Amendment bars the Fund's state law claims (Counts II & III).

_____

[8] Federal subject matter jurisdiction is a necessary condition for application of an abstention doctrine.  *See, e.g., Colo. River Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976).

**A.    Whether the Fund's Fourteenth Amendment Procedural Due Process Claim (Count I) Is Ripe**

The Fund alleges that it has been deprived of procedural due process by the actions of Defendants enforcing the criminal laws of Alabama relating to the electronic bingo machines at Country Crossing without providing it an adequate remedy.[9]   The Fund's argument fails because it seeks to adjudicate the constitutionality of the remedies afforded the Fund under Alabama law based on Defendants' possible future actions.  Because there is no allegation of an actual seizure of the electronic bingo machines, and necessarily no cognizable deprivation of the Fund's alleged property right, any procedural due process inquiry at this time would amount to conjecture.  Thus, the Fund's claim is not ripe.

Federal courts are obligated to address jurisdictional questions *sua sponte*. *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1250 (11th Cir. 2008).  "The ripeness doctrine keeps federal courts from deciding cases prematurely and protects them from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *United States v. Rivera*, 613 F.3d 1046, 1050 (11th Cir. 2010) (citation and internal quotation marks omitted).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* (citation and internal quotation marks omitted).  "In deciding whether a case is ripe, [courts] look primarily at two

---

[9] The Fund has not alleged that Defendants' actions constitute a substantive due process violation. *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (A substantive due process violation is complete when it occurs, regardless of an adequate post-deprivation remedy.  "By contrast, a procedural due process violation is not complete unless and until the State fails to provide due process.") (internal quotation marks omitted).

considerations: the hardship to the parties of withholding court consideration and the fitness of the issues for judicial decision." *Ala. Power Co. v. United States Dep't of Energy*, 307 F.3d 1300, 1310 (11th Cir. 2002) (citation and internal quotation marks omitted).   As explained in *Alabama Power Company*, "'the ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and never may occur, from those cases that are appropriate for federal court action.'"   *Id.* at 1310 n.9 (quoting Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1 (3d ed. 1999)).   Stated another way, "[r]ipeness should be understood as involving the question of *when a party may seek preenforcement review of a statute or regulation*."   Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1 (5th ed. 2007).

The speculative nature of this case at this stage becomes clear upon review of the procedural due process precedent that the Fund asks this court to apply.   "It is axiomatic that, in general, the Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property."   *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994).   "In this circuit, a § 1983 claim alleging a denial of due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process.*"   Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).   "[A] procedural due process violation is not complete unless and until the State fails to provide due process."   *McKinney*, 20 F.3d at 1557 (citation and internal quotation marks omitted).

"In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under § 1983 arise."  *Id.*  "*McKinney* is based on a recognition that the process a state provides is not only that employed by the board, agency, or other governmental entity whose action is in question, but also includes the remedial process state courts would provide if asked."  *Horton v. Bd. of Cnty. Comm'rs of Flagler Cnty.*, 202 F.3d 1297, 1300 (11th Cir. 2000) (Carnes, J.).  As Judge Carnes described it, *McKinney* stands for the rule that a plaintiff fails to state a cognizable claim for a violation of procedural due process if the "state courts, if asked, generally would provide an adequate remedy for the procedural deprivation the federal court plaintiff claims to have suffered."  *Id.*  *McKinney* and *Horton* show that though ripeness and exhaustion do not necessarily control the inquiry into "constitutionally inadequate process," a plaintiff seeking to avail itself of federal jurisdiction still must allege a case or controversy based on facts ripe for federal adjudication.

At this stage, Defendants have done nothing to invoke the Fund's procedural due process rights.  The Fourteenth Amendment commands "that some kind of hearing is required at some time before a State *finally* deprives a person of his property interests."  *Parratt v. Taylor*, 451 U.S. 527, 540 (1981) (emphasis added), *abrogated on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  More precisely, "[t]he fundamental right of due process is the opportunity to be heard and it is an opportunity which must be granted at a

meaningful time and in a meaningful manner." *Id.* The Supreme Court, however, has "rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the state to provide a hearing prior to the initial deprivation of property." *Id.; see also id.* at 539 (compiling cases); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679-80 (1974) (allowing postponement of notice and hearing until after the seizure of a yacht in order to advance the important governmental and general public interest in gaining *in rem* jurisdiction over the property, in preventing removal, destruction or concealment of moveable property, and in allowing local authorities to determine whether seizure is appropriate under local statutes). Because the owner and operator of the electronic bingo machines lack an absolute right to notice and an opportunity to be heard prior to seizure by Defendants, it necessarily follows that the Fund's alleged property interest in the revenues from the bingo machines also commands no such right.

Defendants have not yet initially deprived, much less finally deprived, the Fund of any alleged property rights. The electronic bingo machines remain in the possession of either Nonprofit Bingo or the Developer, third parties not before the court. The Fund admits that there has been no actual seizure by state authorities. (Am. Compl. ¶ 26 ("A seizure of the electronic bingo machines *would* have a disastrous impact on the ability of the Cooperative District to pay Entertainment Fees – a significant source for the payment of the Series 2009 bonds.") (emphasis added).) Instead, the Fund asks the court to find that Defendants' threatened interference with the Developer and Nonprofit Bingo's operation of the electronic

bingo machines amounts to a cognizable deprivation of the Fund's property interest in the bond revenues paid by the Cooperative District from the entertainment fees.[10]  The court declines to make such a finding.  Because Country Crossing, who is not a party to this action, decided to close all of its operations, including electronic bingo, and Defendants and Alabama courts do not have possession or any other dominion over the electronic bingo machines, the Fund's "effective" deprivation argument does nothing to trigger a constitutional deprivation.[11]

Without an actual seizure and with the electronic bingo machines remaining in the possession and ownership of Country Crossing and its affiliates, any procedural due process inquiry by this court would amount to pure speculation.  The need for speculation is confirmed by the fact-specific nature of procedural due process review.  The courts have consistently held that "due process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citation omitted).  Such a flexible inquiry in this case would be predicated on an assumption that a future seizure will happen exactly as the Fund alleges.  In reality, any future due process inquiry the court would conduct depends on the course of action chosen by Defendants, *if* they choose to seize the bingo machines.  At this stage, the court is left to guess: Will

---

[10] The Cooperative District has filed suit in this district alleging violations by Mr. Tyson of its Fourth and Fourteenth Amendment rights and its rights under the Contracts Clause of the United States Constitution. *See The Coop. Dist. of Houston Cnty. – Country Crossing Project v. Tyson*, No. 10-CV-49-MHT, at *21-25 (M.D. Ala. Mar. 8, 2010) (Amended Complaint).

[11] The legal consequences of Country Crossing's decision to close will be discussed further in Parts IV.B and IV.C.

Defendants pursue a criminal prosecution and forfeiture against Nonprofit Bingo employees or the Developer, or instead file a civil forfeiture action, or merely investigate the machines for compliance with Alabama law, or none of the above? These facts are inscrutable at this point, and any flexible procedural due process inquiry is likewise impossible.

The lack of hardship of withholding the court's consideration at this stage is confirmed by reviewing the Fund's rights in the event of a seizure of the electronic bingo machines. If Defendants were to seize the electronic bingo machines at Country Crossing, the Fund would lack standing to challenge the reasonableness of any such search and seizure under the Fourth Amendment. As alleged, the Fund does not own the Country Crossing premises or the electronic bingo machines. No other facts are alleged that suggest that the Fund can vicariously assert its alleged property rights as a basis for contesting a future search or seizure. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Likewise, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134.

And, as in a criminal proceeding, the Fourth Amendment applies to civil forfeiture proceedings in federal and Alabama courts. *See One 1958 Plymouth Sedan v. Pa.*, 380 U.S. 693, 702 (1965); *Kevin Sharp Enters., Inc. v. State ex rel. Tyson*, 923 So. 2d 1117, 1121 (Ala. Civ. App. 2005).

Finally, if the Fund's allegation that "under Alabama law, [the Fund] would not have standing to assert its rights in [a post-seizure civil forfeiture proceeding]" were to come to fruition (Am. Compl. ¶ 27), it would only affirm that its alleged property right in the Series 2009 bond revenues simply does not exist under Alabama law, and it would have no procedural due process claim. This is because "[p]roperty interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Analysis of the Fund's alleged property right hinges on a purely state law determination.[12] Such an inquiry is better left to an Alabama court following any action by Defendants against the electronic bingo machines.[13] If the state finds that the Fund lacks standing to challenge or participate in such a forfeiture proceeding because Alabama law does not recognize its alleged property right, it follows that the Fund would fail to state a procedural due process claim. Without a property right, the Fund is due no procedural

---

[12] Other United States District Courts that have considered the legal issues surrounding gaming in Alabama have found it to be solely a question of state law. *See The Coop. Dist. of Houston Cnty. – Country Crossing Project v. Tyson*, No. 10-CV-49-MHT, at *3 (M.D. Ala. Feb. 1, 2010) (order denying motion for a temporary restraining order); *Dep't of Tex. Veterans of Foreign Wars of the U.S. v. Dorning*, No. 07-S-2144-NE, at *21-28 (N.D. Ala. Sept. 28, 2009) (order granting defendant's motion for summary judgment); *Taylor v. Siegelman*, 230 F. Supp. 2d 1284, 1291 (N.D. Ala. 2002); *A & M Enters., LLC v. Houston*, 179 F. Supp. 2d 1356, 1363 n.5 (M.D. Ala. 2001); *Novel Mgmt., Inc. v. Woodward*, No. 01-BV-1699-S, 2001 WL 1846798, at *3 (N.D. Ala. July 13, 2001).

[13] The legality of electronic bingo and the regulations pertaining to electronic bingo are unsettled issues of Alabama law. *See, e.g., Barber v. Cornerstone Cmty. Outreach, Inc.*, 42 So. 3d 65 (Ala. 2009).

remedy under the Fourteenth Amendment, and a hearing would be little more than constitutional karaoke.

Given the court's inability to divine Defendants' future course of conduct regarding the electronic bingo machines, Country Crossing's decision to close all of its operations, and the flexible inquiry required by procedural due process, any consideration of this case at this stage would stretch the limits of conjecture. Therefore, the Fund's procedural due process claim is not justiciable.

**B.**    **Whether *Ex parte Young* Commands that the Fund's Federal Claim Is Ripe**

The Fund argues that applying the ripeness doctrine violates the principles of *Ex parte Young*. (Doc. # 31, at 6 (The Fund argues that "the United States Supreme Court beginning with *Ex parte Young* . . . has flatly rejected the proposition that a party must expose itself to criminal exposure or confiscatory liability before obtaining a hearing to determine the constitutionality of a state official's actions."); *see Younger v. Harris*, 401 U.S. 37, 45 (1971) ("*Ex parte Young* . . . and following cases have established the doctrine that, when absolutely necessary for protection of constitutional rights, courts of the United States have power to enjoin state officers from instituting criminal actions.") (citing *Ex parte Young*, 209 U.S. 123 (1908)). The Fund urges that its procedural due process claim is ripe based on the threat of state action against Country Crossing and the owners and operators of the electronic bingo machines. Thus, the Fund argues that the court should vicariously apply *Ex parte Young* despite the fact that Country Crossing decided to close all of its operations rather than face

action by state officers.  The Fund's argument fails because it misapplies the *Ex parte Young* line of cases, and its particular situation and legal challenge do nothing to implicate this court's subject matter jurisdiction.

Unlike the plaintiffs in *Ex parte Young* and its line of cases, the Fund is not challenging the constitutionality of the Alabama criminal statutes.  Nor is the Fund a target of any alleged criminal prosecution as those plaintiffs were.  As the Supreme Court has stated, "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs [to challenge the constitutionality of a criminal statute]."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citing *Younger*, 401 U.S. at 42).  Likewise, "when plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court."  *Id.* at 298-99.  In fact, the Fund has not alleged that Defendants' actions in attempting to seize the electronic bingo machines are illegal under federal law.  Rather, it asks this court to enjoin Defendants from enforcing the Alabama criminal laws on the basis that the Alabama courts have created a procedural due process violation by failing to hear another party's declaratory judgment action or grant the Fund standing in a future post-seizure civil forfeiture hearing.  There is simply no allegation that the Fund is a target of threatened criminal prosecution or that the Alabama criminal laws in question are unconstitutional. The Fund may find itself in a pickle, but it is not the sort of dilemma

contemplated by *Ex parte Young*.  The Fund faces no state enforcement action that compels

it to conform or curtail its conduct to avoid an allegedly unconstitutional state enforcement

action.[14]  *Ex parte Young* does not apply.

**C.**   **Whether the Fund Lacks Standing to Challenge Defendants' Actions**

Even if this case were ripe, a serious question exists as to whether the Fund's alleged

injury is "fairly traceable to [D]efendants' conduct" and, thus, whether the Fund has satisfied

the causation element of Article III standing.  *Mulhall v. UNITE HERE Local 355,* 618 F.3d

1279, 1286 (11th Cir. 2010); *see also United States v. Hays*, 515 U.S. 737, 742 (1995)

(observing that standing is a jurisdictional requirement that must be addressed, even if not

raised by the parties).

Article III standing requires that a plaintiff allege "a causal connection between the

injury and the conduct complained of – the injury has to be fairly traceable to the challenged

action of the defendant, and not the result of the independent action of some third party not

before the court."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  But, "[w]hen

the suit is one challenging the legality of government action or inaction, the nature and the

extent of facts that must be [alleged] . . . to establish standing depends considerably upon

---

[14] As Justice Scalia explained, "In each of these cases [*Ex parte Young* and its progeny], the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease or distribute handbills at the shopping center)."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).  He also explained, "[plaintiff's elimination of his protected activity] did not preclude subject-matter jurisdiction because the threat eliminating behavior was effectively coerced."  *Id*. Thus, these cases were ripe for review because the plaintiff's conduct was coerced by the threat of state criminal enforcement.  That is simply not the case here.  It is the actions of third parties not before the court that preclude the ripeness of this case, not any coercion directed at the Fund.

whether the plaintiff is himself an object of the action . . . at issue." *Id.* at 561.  In cases such as this one, "[w]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.* at 562.  A plaintiff's burden is substantially more difficult, but it may still establish causation where its injury was "produced by [the defendant's] determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 168 (1997); *but see Allen v. Wright*, 468 U.S. 737, 758-59 (1984) (holding that there was no causation where the injury to plaintiffs resulted from the independent decisions of third parties not before the court); *see also Ala.-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1254 (11th Cir. 2003) (discussing the difference between economic injuries that are caused by the defendant's coercive action against a third party versus those that are merely a result of independent actors not before the court).

As to causation, the Fund alleges:

> Defendants' interference with the operation of electronic charity bingo machines and threats to seize those machines have already caused irreparable harm to [the Fund] by halting the generation of Entertainment Fees and other Pledged Revenues designated for payment of the Series 2009 [b]onds in the Bond Validation Opinion and by consequently decreasing the liquidity, marketability, and value of the [b]onds.

(Am. Compl. ¶ 26.)  The Fund alleges that Defendants' "interference" has caused its injury, but such an allegation ignores a central link in the causation chain:  The Fund's injury is the direct result of a decision made by Country Crossing to close all of its operations.  Glaringly absent in the Amended Complaint is any mention of the entity or person who made the

24

decision to close Country Crossing.  Rather, the Fund merely pleads, in passive form, that, "*[b]ecause Country Crossing was closed* . . . and [Mr.] Tyson did not have a search warrant, he was unable to seize the electronic bingo machines upon which the Entertainment Fees are levied."  (Am. Compl. ¶ 24 (emphasis added).)  This causal link and its effect on the "fairly traceable" test cannot be ignored.

In a "but for" sense, it may be that the Fund's financial harm is the result of the coercive effect of Defendants' threatened actions on the unidentified entity or individual who shut down all of Country Crossing's operations.  However, because the Fund is not the object of the state action it is challenging, it must show substantially more than simple "but for" causation to satisfy the fairly traceable test.  *Lujan*, 504 U.S. at 562.

Country Crossing may have chosen to take a principled stand against Defendants because it disagreed with their actions, but its voluntary decision to close and cease all operations appears to be what imperiled the Pledged Revenues supporting the Series 2009 bonds.  Article III standing remains a difficult hurdle for the Fund to clear in any future action against state officials.[15]

---

[15] Another observation:  Causation sufficient for Article III standing is even more tenuous in a contractual sense.  According to a fair reading of the documents attached to the Amended Complaint, a remedy of a bondholder in the event of default is against the bond issuer (in this case, the Cooperative District).  Likewise, it appears that the Trustee has the right to advocate for the remedies on behalf of the bondholders.  Moreover, interposed between the bondholders and Defendants would be, at minimum, the Cooperative District and the nonprofit organization that operates electronic bingo.  Though the documents are not entirely clear on the facts, the Developer and the Trustee may also interrupt the chain of causation.  Thus, it may be that the bondholders' remedy rests against the Trustee, which should claim its losses, per contract, from the issuer, which should seek a remedy from either the Developer or the nonprofit, or both, for failure to pay the entertainment fees and other pledged revenues.  Ultimately, Country Crossing was the direct target of Defendants' alleged coercion, and for its own reasons, inscrutable at this point, it closed down.  Many contractual causeways of causation remain to be constructed to get from Defendants to the Fund.

**D.**     **Whether Counts II and III Are Barred by the Eleventh Amendment**

Even if this were a justiciable case or controversy, the Fund's state law claims, Counts II and III, are barred by the Eleventh Amendment, and this court lacks subject matter jurisdiction to hear them.  *See Pennhurst State Sch. & Hosp. v. Haldermann*, 465 U.S. 89, 99 n.8 (1984) (Immunity under the Eleventh Amendment deprives a court of subject matter jurisdiction.).

The Fund concedes that if Defendants do not waive their sovereign immunity, it "does not dispute that any requested relief in Counts Two and Three in conflict with *Pennhurst* is subject to dismissal without prejudice."  (Doc. # 18, at 22 (citing *Pennhurst*, 465 U.S. at 106).)  The Fund's concession truncates the court's analysis, because all of the relief requested by the Fund in Counts II and III, absent a viable Fourteenth Amendment procedural due process claim, would violate *Pennhurst*.

Generally, "the Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'"  *Pennhurst*, 465 U.S. at 101 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).  "And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief."  *Id.* at 101-02.  An exception to Eleventh Amendment immunity exists, however, where a plaintiff seeks prospective injunctive relief against a defendant in his or her official capacity in order to end continuing violations of federal law.  *See Ex parte Young*, 209 U.S. at 123; *Fla. Assoc. of Rehab.*

*Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219 (11th Cir. 2000). That exception is a narrow one, however, and "when a plaintiff alleges that a state official has violated *state* law," the entire basis for the *Ex parte Young* exception disappears. *Pennhurst*, 465 U.S. at 106. This is because "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* Unless a suit for injunctive relief is predicated on an ongoing violation of federal law, the suit conflicts "directly with the principles of federalism that underlie the Eleventh Amendment," and is therefore barred by sovereign immunity. *Id.*

### 1.    *Count II*

The Fund's claim for injunctive relief against Governor Bentley and Mr. Tyson in their official capacities is barred by the Eleventh Amendment. The Fund does not allege that either state official has violated or is continuing to violate federal law. Its claim for injunctive relief is instead predicated on Defendants' alleged violations of Alabama law in their official capacities. The Fund seeks to enjoin Defendants from "(1) asserting in any court in the State of Alabama that the operation of the electronic charity bingo machines in the Cooperative District is illegal or prohibited under Alabama law; and (2) from taking any actions to interfere with the operation of electronic charitable bingo machines in the Cooperative District." (Am. Compl. ¶ 48.) Both elements of the requested injunctive relief ask the court to command state officials how to do their respective jobs in conformity with Alabama law. The court would be required to order such requested relief under state law,

an order that is barred by the Eleventh Amendment and *Pennhurst*. *See Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989) (holding that the determinative question on whether prospective injunctive relief against a state official is barred by Eleventh Amendment immunity under *Pennhurst* "is not the relief ordered, but whether the relief was ordered pursuant to state or federal law").  Thus, subject matter jurisdiction is lacking on Count II of the Fund's Amended Complaint.

2.     ***Count III***

The Fund's Amended Complaint seeks a judgment declaring that, under state law:

(1) the electronic charity bingo machines upon which the Entertainment Fees are levied may be legally operated in the Cooperative District; (2) neither Defendants or anyone else may be heard at this late date to call the validity or legality of the electronic charity bingo machines upon which the Entertainment Fees are levied into question; and (3) Defendants are barred from attacking the operation of electronic charity bingo machines in the Cooperative District or from seeking to prevent the operation of electronic charity bingo machines in the Cooperative District.

(Am. Compl. ¶ 55.)  The Fund's claim for a declaratory judgment is predicated on state law only, and alleges no violation of federal law by Defendants.

The Supreme Court has held that "federal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute, whether an attack is made on the constitutionality of the statute on its face or as applied." *Steffel v. Thompson*, 415 U.S. 452, 475 (1974).  The Fund's request for a declaratory judgment makes no such attack on the federal constitutionality of the state statutes at issue.  The Fund's prayer for declaratory

judgment adds nothing to its prayer for injunctive relief. *See Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). Thus, the same *Ex parte Young* Eleventh Amendment "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" also applies to the declaratory relief sought here. *Id*. Because the *Ex parte Young* exception to sovereign immunity is inapplicable in a suit against state officials on the basis of state law, Defendants' Eleventh Amendment immunity is not abridged by *Steffel*. Therefore, Defendants' Eleventh Amendment sovereign immunity also precludes subject matter jurisdiction on Count III.

## V. CONCLUSION

Accordingly, it is ORDERED that Defendants' Motion to Dismiss (Doc. # 13) is GRANTED, and Plaintiff's Amended Complaint is DISMISSED without prejudice.

It is further ORDERED that Plaintiff's motion for a preliminary and permanent injunction (Docs. # 15-16) is DENIED as moot.

A final judgment will be entered separately.

DONE this 20th day of January, 2011.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE